**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORTHWEST REQUIREMENTS UTILITIES; PUBLIC POWER COUNCIL; THE CITY OF SEATTLE, <br>                *Petitioners*, | No. 13-70391 <br><br> FERC Nos. <br> EL11-44-000 <br> EL11-44-001 |

POWEREX CORPORATION; SACRAMENTO MUNICIPAL UTILITY DISTRICT; TURLOCK IRRIGATION DISTRICT; AVISTA CORPORATION; CANNON POWER CORPORATION, CAITHNESS SHEPHERDS FLAT, LLC; E. ON CLIMATE & RENEWABLES NORTH AMERICA LLC; EURUS COMBINE HILLS II LLC; IBERDROLA RENEWABLES, LLC; M-S-R PUBLIC POWER AGENCY; NORTHWEST UTILITIES; PUGET SOUND ENERGY, INC.; PACIFICORP; PORTLAND GENERAL ELECTRIC COMPANY; PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON; PPL MONTANA, LLC; CHARLES PACE,
               *Intervenors*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent.*

NATIONAL RURAL ELECTRIC               No. 13-70499
COOPERATIVE ASSOCIATION; PACIFIC
NORTHWEST GENERATING                   FERC Nos.
COOPERATIVE; AMERICAN PUBLIC          EL11-44-000
POWER ASSOCIATION,                    EL11-44-001

*Petitioners*,

CAITHNESS SHEPHERDS FLAT, LLC;
CANNON POWER CORPORATION; E. ON
CLIMATE & RENEWABLES NORTH
AMERICA LLC; EURUS COMBINE
HILLS II LLC; IBERDROLA
RENEWABLES, LLC; M-S-R PUBLIC
POWER AGENCY; NORTHWEST
UTILITIES; PUGET SOUND ENERGY,
INC.; PACIFICORP; POWEREX
CORPORATION; SACRAMENTO
MUNICIPAL UTILITY DISTRICT;
TURLOCK IRRIGATION DISTRICT; PPL
MONTANA, LLC; PUBLIC UTILITY
DISTRICT NO. 1 OF SNOHOMISH

COUNTY, WASHINGTON; CHARLES
PACE,
                    *Intervenors*,


                    v.


FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent*.


PUBLIC UTILITY DISTRICT NO. 1 OF              No. 13-70581
SNOHOMISH COUNTY, WASHINGTON,
                    *Petitioner*,              FERC Nos.
                                              EL11-44-000
CAITHNESS SHEPHERDS FLAT, LLC;                EL11-44-001
CANNON POWER CORPORATION; E. ON
CLIMATE & RENEWABLES NORTH
AMERICA LLC; EURUS COMBINE
HILLS II LLC; IBERDROLA
RENEWABLES, LLC; M-S-R PUBLIC
POWER AGENCY; NORTHWEST
UTILITIES; PUGET SOUND ENERGY,
INC.; PACIFICORP; POWEREX
CORPORATION; SACRAMENTO
MUNICIPAL UTILITY DISTRICT; PPL
MONTANA, LLC; CHARLES PACE,
                    *Intervenors*,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent*.

NORTHWEST REQUIREMENTS                 No. 13-72928
UTILITIES; PUBLIC POWER COUNCIL;
THE CITY OF SEATTLE; PUBLIC             FERC No.
UTILITY DISTRICT NO. 1 OF               EL11-44-004
SNOHOMISH COUNTY, WASHINGTON;
NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION; PACIFIC        OPINION
NORTHWEST GENERATING
COOPERATIVE; AMERICAN PUBLIC
POWER ASSOCIATION,

                          *Petitioners*,

EDP RENEWABLES NORTH AMERICA
LLC; INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES; M-S-R
PUBLIC POWER AGENCY; NORTHWEST
AND INTERMOUNTAIN POWER
PRODUCERS COALITION; PUGET
SOUND ENERGY, INC; PORTLAND
GENERAL ELECTRIC COMPANY;
POWEREX CORPORATION;
SACRAMENTO MUNICIPAL UTILITY

DISTRICT; TRANSALTA ENERGY
MARKETING (U.S.), INC.,
                        *Intervenors*,


                  v.


FEDERAL ENERGY REGULATORY
COMMISSION,
                        *Respondent*.


On Petition for Review of an Order of the
Federal Energy Regulatory Commission


Argued and Submitted
May 5, 2015—Portland, Oregon


Filed August 10, 2015


Before: William A. Fletcher and Andrew D. Hurwitz,
Circuit Judges and Donald E. Walter,* Senior District
Judge.


Opinion by Judge Hurwitz

---

* The Honorable Donald E. Walter, Senior District Judge for the U.S.
District Court for the Western District of Louisiana, sitting by
designation.

## SUMMARY[**]

### Federal Energy Regulatory Commission

The panel denied petitions for review, brought by wholesale electricity customers, seeking review of orders by the Federal Energy Regulatory Commission that require the Bonneville Power Administration – a federal agency that both markets electricity and operates a large portion of the transmission grid in the Pacific Northwest – to provide transmission services on terms "not unduly discriminatory or preferential."

Petitioners were either "preference customers" of the Bonneville Power Administration, or trade organizations representing the interests of the Bonneville Power Administration's preference customers. Petitioners alleged that FERC exceeded its statutory authority in issuing a nondiscrimination mandate, and FERC failed to provide reasoning for its decision.

The panel held that petitioners demonstrated Article III standing where petitioners established injury in fact, causation, and redressability.

The panel held that petitioners lacked statutory standing to pursue their claims because they were not "aggrieved" within the meaning of Federal Power Act § 313(b) and Administrative Power Act § 10. APA "aggrievement"

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

requires that the alleged protected interest be "arguably within the zone of interests to be protected or regulated by the statute in question."  The panel held that petitioners' interests were not arguably protected by § 211A of the Federal Power Act.

## COUNSEL

Zabyn Towner, Portland, Oregon, for Petitioner Pacific Northwest Generating Cooperative.

Betsy Bridge (argued), Portland, Oregon, for Petitioner Northwest Requirements Utilities.

Irene A. Scruggs, Portland, Oregon, for Petitioner Public Power Council.

Thomas L. Blackburn and Peter K. Matt, Schiff Hardin LLP, Washington, D.C., for Petitioners National Rural Electric Cooperative Association and American Public Power Association.

Sarah Dennison-Leonard, Portland, Oregon, for Petitioner The City of Seattle.

Giuseppe Fina, Assistant General Counsel, and Anne L. Spangler, General Counsel, Everett, Washington, for Petitioner Public Utility District No. 1 of Snohomish County, Washington.

David L. Morenoff, Acting General Counsel, Robert H. Solomon, Solicitor, and Beth G. Pacella (argued), Senior Attorney, Washington, D.C., for Respondent Federal Energy Regulatory Commission.

Michael G. Andrea, Spokane, Washington, for Intervenor Avista Corporation.

Scott G. Seidman, Tonkon Torp, LLP, Portland Oregon, for Intervenor Portland General Electric Company.

Donald G. Kari and Jason T. Kuzma, Perkins Coie LLP, Bellevue, Washington, for Intervenor Puget Sound Energy, Inc.

Paul L. Gale (argued), Troutman Sanders LLP, Irvine, California; Lara L. Skidmore, Troutman Sanders LLP, Portland, Oregon, for Respondent-Intervenor Iberdrola Renewables, LLC.

Stephen C. Hall, Troutman Sanders LLP, Portland, Oregon, for Respondent-Intervenor Cannon Power Group, LLC.

Kari L. Vander Stoep and Andrew B. Young, K&L Gates LLP, Seattle, Washington, for Respondents-Intervenors Northwest and Intermountain Power Producers Coalition and TransAlta Energy Marketing (U.S.), Inc.

Thomas J. McCormack, Chadbourne & Parke LLP, New York, New York, for Respondent-Intervenor Eurus Combine Hills II LLC.

John A. Cameron, Davis Wright Tremaine LLP, Portland, Oregon, for Respondent-Intervenor Caithness Shepherds Flat, LLC.

Jay T. Waldron and Sara Kobak, Schwabe, Williamson &Wyatt, PC, Portland, Oregon; Jeffrey B. Erb, PacifiCorp, Portland, Oregon, for Respondent-Intervenor PacifiCorp.

## OPINION

HURWITZ, Circuit Judge:

These are consolidated petitions for review of orders by the Federal Energy Regulatory Commission ("FERC") that require the Bonneville Power Administration—a federal agency that both markets electricity and operates a large portion of the transmission grid in the Pacific Northwest—to provide transmission services on terms "not unduly discriminatory or preferential." Bonneville has complied with the orders, and is not a party to this proceeding. The petitioners, instead, are wholesale electricity customers of Bonneville who challenge the orders on substantive and procedural grounds. We conclude that they lack statutory standing to pursue their claims.

## I

## A

Bonneville markets electric power generated at federal hydroelectric dams in the Columbia River Basin. Its power customers are primarily public and private utilities that purchase wholesale electricity. *See Nw. Envt'l Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 672–73 (9th Cir. 2007); *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1164 (9th Cir. 1997). Bonneville also operates 80% of the electricity transmission network in the Pacific Northwest. Thus, Bonneville supplies interconnection and transmission services to public and private power generators, including itself.

Bonneville is self-funded and must recover its costs through rates charged to customers. *See* 16 U.S.C. §§ 838g, 839e(a)(1); *see also id.* § 839(4). Its rates are "based upon [its] total system costs." *Id.* § 839e(a)(2)(B).

Bonneville is also subject to a potentially conflicting mandate to market power "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles." *Id.* § 838g; *see also Ass'n of Pub. Agency Customers*, 126 F.3d at 1164.

Bonneville must also comply with various environmental protection requirements. The amount of water that can be stored behind Bonneville's dams is limited. *See, e.g.*, Bonneville Power Admin., BPA's Interim Environmental Redispatch and Negative Pricing Policies, Administrator's Final Record of Decision 11 (May 2011) ("2011 ROD"), http://tinyurl.com/pcgt3pj. But so is the amount of water that can pass over a dam's spillway. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 789 & n.3 (9th Cir. 2005) (per curiam); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 92 F. Supp. 2d 1072, 1074–75 (D. Or. 2000); 2011 ROD 5–6. Under the Clean Water Act, states have authority to cap the amount of dissolved gas in Columbia River Basin water. *See Nat'l Wildlife*, 92 F. Supp. 2d at 1074–75; 2011 ROD 5–6. Dissolved gas, which harms fish, increases when water is spilled over a dam; spill must therefore "be carefully managed to avoid gas supersaturation." *Nat'l Wildlife*, 422 F.3d at 789.

Bonneville is further constrained by the realities of operating hydroelectric dams on an electrical grid. Water that cannot be spilled over Bonneville's dams must pass through the turbines, generating electricity. This electricity must be consumed to maintain transmission stability. Reliability standards therefore require Bonneville to maintain the balance between supply and demand on its electrical grid. 2011 ROD 7.

**B**

The demand for electricity is finite. When spill must be limited, Bonneville can dispose of excess electricity by marketing it to other generators at low prices or giving it away, thereby displacing electricity those sources would ordinarily generate. Fossil fuel and nuclear generators gladly accept such inexpensive hydropower because it allows them to save on fuel costs by reducing their more costly output or shutting down entirely. Wind generators, in contrast, do not have fuel costs, and are federally subsidized based on the amount of energy they generate. The availability of free hydropower therefore does not generally cause them to reduce production.

In response to a substantial increase in wind generation on Bonneville's transmission system and anticipated high water levels in the Columbia River Basin, Bonneville promulgated an Environmental Redispatch Policy ("ER Policy") in May 2011, to remain in effect until the end of March 2012. *Id.* at 8, 14–17. The ER Policy allowed Bonneville to curtail the customers' electricity generation unilaterally through "Dispatch Orders." *Id.* at 8, 16–17. Dispatch Orders were to be issued only as a last resort during "overgeneration events" when spill limits were reached, water levels required Bonneville to generate electricity that outpaced demand, and excess hydropower could not be disposed of at low or zero prices or by curtailing non-wind generation. *Id.* at 14–16.

Under the ER Policy, Bonneville redispatched wind generation for over two hundred hours between May 18 and June 18, 2011, curtailing 5.4% of the wind generation on Bonneville's transmission system during that period. Bonneville initially estimated that this caused wind

generators to lose approximately $50 million in federal credits, although the estimate was later reduced.

## C

On June 17, 2012, a group of wind generators filed a FERC complaint against Bonneville, seeking an order that Bonneville "immediately revise its [ER Policy] to comport with the undue discrimination standards of [Federal Power Act] Section 211A." Several wholesale energy customers of Bonneville and trade organizations intervened, contending that "[i]f the Commission were to order [Bonneville] to pay the requested compensation to the Complainants, [Bonneville] could pass on those costs to its customers . . . in future rate proceedings." On December 7, 2011, FERC concluded that the ER Policy "results in noncomparable transmission service that unfairly treats non-Federal [i.e., wind] generating resources connected to Bonneville's transmission system," and ordered Bonneville,

> pursuant to section 211A of the FPA, . . . to file . . . tariff revisions to address the comparability concerns raised in this proceeding in a manner that provide[s] for transmission service on terms and conditions that are comparable to those under which Bonneville provides transmission services to itself and that are not unduly discriminatory or preferential.

FERC emphasized that its order was prospective and that it was "making no determinations as to whether actions taken by Bonneville in the past, whether pursuant to the Environmental Redispatch Policy or otherwise, were prohibited."

**D**

In order to comply with the December 2011 FERC order, on March 6, 2012, Bonneville submitted for FERC approval a temporary Oversupply Management Protocol ("OMP I"). The OMP I, to be effective until March 2013, permitted Bonneville to unilaterally redispatch wind generation during oversupply conditions, but called for "compensation to renewable generators for the costs they incur from being displaced," at a rate of 50% of the costs they incurred. On December 20, 2012, FERC conditionally approved the OMP I "as a balanced interim measure that addressed Bonneville's oversupply problems," but found that the cost-sharing arrangement was not equitable and ordered Bonneville to propose a different scheme.

Bonneville filed a new compliance protocol on March 1, 2013 ("OMP II"), but was granted leave to defer revising the cost-allocation component of the protocol pending the filing of a rate-setting proceeding pursuant to the Northwest Power Act. *See Order on Compliance & Revised Oversupply Management Protocol Proposal*, 149 F.E.R.C. ¶ 61,044, ¶¶ 10–12 (2014).[1] The OMP II thus unbundled the rate and non-rate aspects of the new redispatch policy; aside from extending the previous policy through September 2015, it left other material provisions unchanged. *Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶¶ 10, 22 (2014); *Order on Compliance & Revised Oversupply Management Protocol Proposal*, 149 F.E.R.C. ¶ 61,044, ¶¶ 10–11, 45–46, 52. In early 2014, Bonneville promulgated a Final Record of Decision in the Northwest

---

[1] The motion for judicial notice of this decision and the decision in *Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043 (2014), is granted.

Power Act rate-setting proceeding with a new cost-allocation methodology. *See Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶ 9; Bonneville Power Admin., OS-14 Bonneville Oversupply Rate Proceeding, Administrator's Record of Decision 22, 47 (Mar. 2014) ("2014 ROD"), http://tinyurl.com/nl3oyvq.[2] This methodology allocated oversupply costs to all generators using Bonneville's transmission services that were in operation during an "oversupply event"—i.e., when redispatch was in effect—based on the proportion of Bonneville's overall transmission that each generator was scheduled to use during the event. *Order on Compliance & Revised Oversupply Management Protocol Proposal*, 149 F.E.R.C. ¶ 61,044, ¶ 13. Bonneville estimated that under this new formula, it would bear approximately 85% of the redispatch costs for oversupply conditions that occurred in 2012. *See id.* ¶ 13 n.22; 2014 ROD 47. Redispatch costs falling on Bonneville would be "recovered from power customers" under a preexisting formula. 2014 ROD 43.

On October 16, 2014, FERC found this methodology compliant with its nondiscrimination mandate. *Order on Compliance & Revised Oversupply Management Protocol Proposal*, 149 F.E.R.C. ¶ 61,044, ¶ 39. FERC also confirmed that "the non-rate terms of Bonneville's [OMP I], taken together with Bonneville's cost allocation methodology . . . , result in comparable transmission service," and that because "[t]he [OMP II] is substantially similar to the [OMP I] . . . the rationale supporting

---

[2] We grant the petitioners' motion to take judicial notice of this document. *See Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002).

conditional acceptance of the non-rate terms and conditions of the [OMP I] . . . appl[ies] with equal force to the [OMP II]." *Id.* ¶ 52.[3]

## E

In January 2012, shortly before Bonneville promulgated the OMP I, various parties, including Bonneville and Bonneville power customers and trade organizations that had intervened in the FERC proceedings, filed petitions for rehearing of FERC's December 2011 order. FERC denied these petitions on December 20, 2012. In January 2013, the power customers requested rehearing of the December 20 order, raising the question of whether FERC in its previous orders had "requir[ed] Bonneville to act in a manner that violates its other governing statutes." FERC denied the motion on June 26, 2013.

## F

Before us are various consolidated petitions for review of the FERC orders. The petitioners, intervenor-respondents in the proceedings below, are either "preference customers" of Bonneville—entities with statutory preferences to buy wholesale electricity, *see* 16 U.S.C. § 832c(a), (d)—or trade organizations representing the interests of Bonneville's

---

[3] Because the rate component of the OMP II was proposed in a rate-setting proceeding, approval was also required under the Northwest Power Act; FERC granted that approval by separate order on the same day. *See Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶¶ 1, 22.

preference customers.  Bonneville does not challenge the
FERC orders.[4]

The petitioners raise two claims.  First, they argue FERC
exceeded its statutory authority in issuing the
nondiscrimination mandate because § 211A only permits
regulation of "transmission services," 16 U.S.C. § 824j-1(b),
and redispatch involves generation, not transmission.
Second, they argue FERC failed to provide reasoning for its
decision to issue the nondiscrimination mandate and to
consider relevant evidence.

Our jurisdiction to review the petitions is governed by
§ 313(b) of the FPA, 16 U.S.C. § 825l(b), and § 10 of the
Administrative Procedure Act, 5 U.S.C. § 702.[5]  Before
considering the claims, however, we must assess the
petitioners' constitutional and statutory standing.  *See Ass'n
of Pub. Agency Customers v. Bonneville Power Admin.*, 733
F.3d 939, 949–50 (9th Cir. 2013).

---

[4] Bonneville initially filed two petitions for review of the FERC orders,
but voluntarily dismissed them before the opening briefs in the
consolidated cases were filed.

[5] The substantive challenge arises under the FPA; we have treated
procedural challenges to FERC actions as arising under both the FPA
and the APA—both of which provide for review on "arbitrary and
capricious" grounds. *See Cal. Trout v. FERC*, 572 F.3d 1003, 1012 n.6
(9th Cir. 2009); *see also Friends of Cowlitz v. FERC*, 253 F.3d 1161,
1165–66 (9th Cir.) (finding jurisdiction under the FPA and APA),
*amended on other grounds by* 282 F.3d 609 (2001).

## II

To satisfy Article III standing requirements, the petitioners must establish injury in fact, causation, and redressability.**[6]** *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The petitioners have the burden to demonstrate a "substantial probability" of standing. *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002). Standing turns on the facts that existed when the petitions were filed. *See D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008); *N.M. Att'y Gen. v. FERC*, 466 F.3d 120, 122 (D.C. Cir. 2006) (per curiam).

## A

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations, footnote, and quotation marks omitted). A future injury need not be "literally certain," but there must be a "substantial risk" that it will occur. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013); *see Munns v. Kerry*, 782 F.3d 402, 409–10 (9th

---

**[6]** Petitioners American Public Power Association, National Rural Electric Cooperative Association, Northwest Requirements Utilities, and Public Power Council are trade organizations representing the interests of Bonneville's "preference customers." Their standing as organizations depends on whether their "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization[s'] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). It is plain that the second and third requirements are satisfied, and thus the standing inquiry for the association petitioners and customer petitioners is the same.

Cir. 2015); *see also San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 701 (9th Cir. 2012) ("[T]hreatened injury constitutes 'injury in fact.'").

The petitioners claim they suffered increased energy prices as a result of the nondiscrimination mandate. Because financial harm in the form of increased prices is concrete and particularized, *see Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989), the only question is whether, at the time the petitions were filed, this injury was imminent.

It plainly was. The December 2011 order found "that Bonneville's [ER Policy] results in noncomparable transmission service" and "direct[ed] Bonneville to file . . . tariff revisions that address the comparability concerns raised in this proceeding." Bonneville responded by revising the redispatch policy to provide compensation to redispatched generators. Because Bonneville is statutorily required to operate on a cost-plus basis, the logical "side-effect" of an increase in costs is "an *increase* in the rates paid by . . . customers." *Pac. Nw. Generating Coop. v. Dep't of Energy*, 580 F.3d 800, 821 (9th Cir. 2008) (citing 16 U.S.C. § 839e(a)(2)); *see also Nw. Envt'l Def. Ctr.*, 477 F.3d at 673 ("As a self-financing power marketing agency, [Bonneville] must set its prices high enough to cover its costs."). At the time of filing, there was therefore a substantial risk that redispatch costs would be passed through to the petitioners. *See Ass'n of Pub. Agency Customers*, 733 F.3d at 952–53 (concluding that retail customers of Bonneville's wholesale energy buyers suffered injury in fact sufficient to permit them to challenge a settlement entered by Bonneville that would increase Bonneville's costs because the customers' "pass-through" contracts required them to absorb increases in the cost of wholesale energy); *Cent. Ariz. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1537–38 (9th Cir.

1993) (concluding that customers of a power generator had suffered injury in fact from an EPA rule requiring the reduction of the generator's emissions, as the generator's costs would likely be passed on to the customers).[7]

## B

To satisfy the causation requirement, the petitioners "must show that the injury is causally linked or 'fairly traceable'" to the FERC orders, and not the result of independent choices by a party not before the Court. *Wash. Envt'l Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013). The agency actions need not be the sole source of injury, and a "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Id.* at 1141–42. When the petitioner "is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded," but it may be "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation marks omitted).

Although electricity rate increases to the petitioners were the result of actions by Bonneville, that non-party's choices were not "unfettered" in a way that breaks causation. *Id.* Because it is undisputed that unilateral redispatch of wind generation is sometimes required for Bonneville to comply with various statutory requirements during "oversupply events," Bonneville's only realistic response to the nondiscrimination mandate was to compensate wind generators for redispatching them. This compensation might

---

[7] Although the nondiscrimination mandate was prospective only, oversupply conditions in 2012 had already caused Bonneville to accrue $2.7 million in expenses (which were indeed ultimately included in subsequent rate increases). *See Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶ 10.

have taken a variety of forms, *see, e.g.*, *Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶ 11 (noting various cost-allocation possibilities), but any compensation would increase Bonneville's costs—which, given Bonneville's cost-plus business model, would in turn increase prices for the petitioners.  The FERC orders thus had a determinative effect on the petitioners regardless of what course of action Bonneville ultimately undertook, and the causation requirement is satisfied.  *See Bennett v. Spear*, 520 U.S. 154, 169 (1997) ("While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (alterations, citation, emphasis, and quotation marks omitted)); *Ass'n of Pub. Agency Customers*, 733 F.3d at 953–54 (finding causation when nonparty's actions were necessarily determined by challenged actions of party).

## C

Whereas "causality examines the connection between the alleged misconduct and injury, . . . redressability analyzes the connection between the alleged injury and requested judicial relief."  *Wash. Envt'l*, 732 F.3d at 1146.  "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision."  *Id.*

Redress for the petitioners in the form of lower electricity rates depends on whether Bonneville would revert to a compensation-free redispatch policy if the FERC orders were invalidated.  To be sure, substantial effort had already been expended in promulgating and approving new redispatch policies and corresponding electricity rates, and this effort would not automatically be undone if the orders

were invalidated. But even if amending the current policy were not worth the effort, the OMP II expires in September 2015, *see Order Confirming & Approving Rate on a Final Basis*, 149 F.E.R.C. ¶ 61,043, ¶ 10, and increases in wind generation on Bonneville's grid make future oversupply crises increasingly likely, *see* 2011 ROD 8. There is therefore a substantial likelihood that new redispatch policies will be promulgated for the near future. And given that Bonneville is required to provide "the lowest possible rates to consumers consistent with sound business principles," 16 U.S.C. § 838g; *see also id.* § 839f(b) (requiring that Bonneville conduct its affairs in a "sound and businesslike manner"); *Pac. Nw. Generating Coop. v. Bonneville Power Admin.*, 596 F.3d 1065, 1080–81 (9th Cir. 2010) (invalidating a contract requiring Bonneville to pay "up to almost $32 million over a nine month period" because Bonneville would "receive nothing in return"), there is also a substantial likelihood that policies promulgated in the absence of a § 211A nondiscrimination mandate would be more favorable to the petitioners. Invalidation of the FERC orders would, accordingly, provide a sufficient likelihood of redress for Article III purposes.[8]

---

[8] The petitioners' challenge on the merits is part substantive and part procedural, and outright invalidation is therefore only one possible outcome. But this has no bearing on the Article III standing inquiry because, under the "procedural rights" doctrine, uncertainty regarding whether an agency will stay its course after following proper procedures on remand does not undermine redressability. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

### III

The petitioners must demonstrate not only Article III standing, but also statutory standing.[9] *See Ass'n of Pub. Agency Customers*, 733 F.3d at 949–50; *City of Redding*, 693 F.3d at 835. This requires that the petitioners have been "aggrieved" within the meaning of FPA § 313(b) and APA § 10.[10] APA "aggrievement" requires that "the interest sought to be protected by the complainant . . . be arguably within the zone of interests to be protected or regulated by the statute in question," *Ass'n of Pub. Agency Customers*, 733 F.3d at 954—in this case, § 211A of the FPA. A similar standard applies to substantive challenges brought directly under the FPA. *See Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 670 (D.C. Cir. 2007) (applying the zone-of-interests test); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) ("[The zone-of-interests test] applies to all statutorily created causes of action; . . . it is a requirement of general application; and . . . Congress is presumed to legislate against the background of the zone-of-interests limitation, which applies unless it is expressly negated." (alteration and quotation marks omitted)). Accordingly, statutory standing for all claims turns on whether the petitioners' interests are arguably protected by § 211A. *See Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 702–04 (D.C. Cir. 1994). This test "is not meant to be especially demanding," *Match-E-Be-*

---

[9] Unlike Article III standing, however, "statutory standing" does not implicate our subject-matter jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014).

[10] Procedural aggrievement is cognizable under APA § 10 and FPA § 313(b), *see Cal. Trout*, 572 F.3d at 1012 n.6, whereas substantive aggrievement is cognizable exclusively under FPA § 313(b).

*Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012), but is not toothless, *see, e.g.*, *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) ("[W]hen, as here, the plaintiff is not the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." (quotation marks omitted)); *see also Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 530–31 (1991) (dismissing under APA zone-of-interests principles); *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 954–60 (D.C. Cir. 2000) (same).

## A

Under § 211A, FERC

> may, by rule or order, require an unregulated transmitting utility to provide transmission services—
>
> > (1) at rates that are comparable to those that the unregulated transmitting utility charges itself; and
> >
> > (2) on terms and conditions (not relating to rates) that are comparable to those under which the unregulated transmitting utility provides transmission services to itself and that are not unduly discriminatory or preferential.

16 U.S.C. § 824j-1(b).  This provision was enacted as part of the Energy Policy Act of 2005 ("EP Act"), Pub. L. No. 109-58, 119 Stat. 594, a comprehensive statute that, among other things, expanded FERC's authority to regulate energy markets.  *See, e.g.*, *Hunter v. FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013).  Section 211A extended FERC's jurisdiction over discrimination in electricity transmission to "unregulated transmitting utilities," including government agencies like Bonneville and electric cooperatives.[11]  *See* 16 U.S.C. § 824(f).  Under § 211A, FERC has the discretion to prevent discrimination in unregulated utilities' transmission services on a prospective basis.  *Id.* § 824j-1(b).

Section 211A was designed to foster an open and competitive energy market by promoting access to transmission services on equal terms.  This is evident from the language of the provision, which prevents anticompetitive behavior by utilities that seek to stifle competitors' generation through control over transmission. *See New York v. FERC*, 535 U.S. 1, 10 (2002) ("[M]arket power through control of transmission is the single greatest impediment to competition.").  It is also evident from the section's title, which mentions "open access," and from the statutory and historical context of the provision, which places it as a recent step in the legislative and administrative effort to progressively open energy markets and level the playing field for generators.  *See, e.g.*, 151 Cong. Rec. S7465 (daily ed. June 28, 2005) (statement of Sen. Kyl) ("[T]he Energy bill expands jurisdiction over those stakeholders in

---

[11] Such entities were, with some exceptions, previously excluded from FERC's jurisdiction and therefore generally not subject to other statutory nondiscrimination mandates enforced by FERC.  *See* 16 U.S.C. §§ 824d(b), 824e(a) (permitting FERC to regulate discrimination in electricity transmission by investor-owned utilities).

electric markets that were previously unregulated by the [Commission].    [It] . . . addresses the Federal Energy Regulatory Commission's efforts to provide open access over all transmission facilities in the United States . . . .").

## B

The interests of Bonneville's wholesale energy customers and their organizational allies do not align with these goals.  Ultimate consumers of energy plainly stand to benefit from open access and increased competition in energy markets.  *See Order No. 890, Preventing Undue Discrimination & Preference in Transmission Serv.*, F.E.R.C. Stats. & Regs. ¶ 31,241, ¶ 60, 72 Fed. Reg. 12,266, 12,276 (2007) (noting that impeded access to transmission "can have significant cost impacts on consumers").  But the interests of Bonneville's wholesale energy customers are different.  They seek to reduce Bonneville's costs, which are passed on to them by statutory mandate.  This goal is, at best, "orthogonal" to the purposes of a statutory provision intended to increase access to transmission markets.[12] *Grand Council of Crees*, 198 F.3d at 958; *cf. Ashley Creek*, 420 F.3d at 936–37, 940 (noting that bare economic interests are outside the zone of interests of the National Environmental Policy Act, which protects environmental interests, regardless of whether economic and environmental interests coincide).  Indeed, as this litigation demonstrates, it can be diametrically opposed to the statute's purposes.

---

[12] Bonneville's electricity prices are, moreover, heavily regulated by an intricate array of other statutory provisions, and "to hold [the petitioners have statutory] standing would be to create a considerable potential for judicial intervention that would distort the regulatory process." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 871 (D.C. Cir. 2001) (per curiam) (quotation marks omitted).

Congress sought to open access and increase competition, while the petitioners seek to reduce access by asserting Bonneville's unilateral right to transmit only its own electricity during overgeneration events. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83 (1986) ("Nor can respondents recover damages for any conspiracy by petitioners to charge higher than competitive prices . . . . Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price . . . ." (citations omitted)). The likelihood that Bonneville's wholesale energy customers will "frustrate [rather] than . . . further [the] statutory objectives" renders them unreliable litigants under § 211A. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987). The zone-of-interests test is therefore not satisfied, and the petitioners lack statutory standing.

## IV

The petitions for review are therefore **DENIED**.